UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINA CARAVELLO,

Plaintiff,

-against-

GARNET HEALTH MEDICAL CENTER and SCOTT BATULIS,

Defendants.

**OPINION & ORDER**

24-CV-01104 (PMH)

PHILIP M. HALPERN, United States District Judge:

Christina Caravello ("Plaintiff") commenced this action against Garnet Health Medical Center and Scott Batulis ("Defendants") on February 15, 2024. (Doc. 1, "Compl.").[1] Plaintiff claims that Defendants failed to accommodate her disability, a "medical incapacity to safely be immunized," and terminated her because of such disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 ("ADA") and the New York State Human Rights Law, N.Y. Exec. Law §§ 290-297 ("NYSHRL"); and interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA") by not offering her FMLA leave when she "became despondent." (*Id.*).

Defendants filed their motion for summary judgment, pursuant to the briefing schedule set by the Court, on September 2, 2025. (Doc. 42;[2] Doc. 43, "Defs. Br."; Doc. 44; Doc. 46,

[1] Citations to specific pages of filings on the docket correspond to the pagination generated by ECF.

[2] Defendants fail to cite any Federal Rule of Civil Procedure in their notice of motion. (*See* Doc. 42). Local Civil Rule 7.1(a)(1) provides that "[a] notice of motion . . . must specify the applicable rules or statutes pursuant to which the motion is brought, and must specify the relief sought by the motion." Failure to comply with the Local Rules is a sufficient ground to warrant denial of a motion. However, the Court has discretion to overlook a failure to comply with Local Rule 7.1 and exercises such discretion on this motion, as the parties have fully briefed the issue as a motion for summary judgment under Federal Rule of Civil Procedure 56(a). *See Singer v. Mass Mut. Life Ins. Co.*, No. 21-CV-08450, 2023 WL 3506404, at *1 n.1 (S.D.N.Y. May 16, 2023), *aff'd*, No. 23-0863, 2024 WL 1172893 (2d Cir. Mar. 19, 2024).

"Saccomano Aff."; Doc. 47, "Goodhart Aff."). Plaintiff filed opposition (Doc. 45, "Pl. Br."; Doc. 49, "Sussman Decl."; Doc. 50, "Sussman Aff."; Doc. 51, "Caravello Decl."),[3] and the motion was fully briefed with the filing of Defendants' reply (Doc. 48, "Reply").

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion for summary judgment and draws them from the pleadings, Defendants' Rule 56.1 Statement of Undisputed Material Facts with Plaintiff's Counterstatement and responses thereto,[4] Plaintiff's Statement of Additional Material Facts and Defendants' responses thereto, and the admissible evidence proffered by the parties. Unless otherwise indicated, the facts cited herein are undisputed.[5]

---

[3] Defendants ask that the Court disregard "inexplicably served incorrect versions of both the Joint Local Rule 56.1 Statement of Material Facts and the Declaration of Michael H. Sussman." (Reply at 1 n.1). To the extent Defendants are referring to the document titled "Plaintiff's Response to Rule 56.1 Statement & Counterstatement" (Doc. 52) filed by Plaintiff, the Court notes that this document appears to be identical to the Local Rule 56.1 Statement filed by Defendants, except that it does not include Defendants' responses to Plaintiff's Counterstatement. Accordingly, the Court cites to the 56.1 Statement filed by Defendants (Doc. 44) throughout this Opinion & Order. Furthermore, it is unclear to the Court whether Defendants are referring to the "Declaration of Michael H. Sussman, Esq" (Doc. 49) or the "Affirmation of Michael H. Sussman, Esq." (Doc. 50) as an "erroneous document[]." However, the Court, in its discretion, considers both the Sussman Declaration and Sussman Affidavit in deciding the instant motion. *See, e.g.*, *Church & Dwight Co. v. Kaloti Enters. of Mich., L.L.C.*, No. 07-CV-00712, 2011 WL 4529605, at *1 n.1 (E.D.N.Y. Sept. 27, 2011) (considering improperly filed affidavit on motion because courts have "discretion to consider documents filed in violation of procedural rules.").

[4] The Court notes that Defendants set forth their 148-paragraph statement of facts and Plaintiff began her counterstatement of facts beginning again at paragraph number one. (*See* Doc. 44). For the sake of clarity, the Court refers to the first section of the document as "56.1 Stmt." (Doc. 44 at 1-23) and the second section as "CntrStmt." (*id.* at 23-34).

[5] The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York instruct that a "paragraph in the [movant's] statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). Furthermore, "[e]ach statement by the . . . opponent . . . including each statement denying and controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . ." *Id.* at 56.1(d). Plaintiff, who is represented by counsel, did not comply with Local Civil Rule 56.1 in many respects, including failing to cite to record evidence showing a disputed material fact for many of the

Garnet Health is a hospital licensed to do business in the State of New York. (56.1 Stmt. ¶ 43). Plaintiff began working for Garnet Health as a Nurse Manager of Hemodialysis on June 24, 2019, and was promoted to Director of Hemodialysis on December 20, 2020. (*Id.* ¶¶ 1, 11). Plaintiff's job duties as Director of Hemodialysis required her to, *inter alia*, move dialysis equipment, machines, and patients, hire and train staff, and update her staff about Garnet Health's policies. (*Id.* ¶¶ 13-17). Plaintiff's duties could not be completed without patient contact. (*Id.* ¶ 107).

Plaintiff maintained her usual schedule and worked fully in-person during the COVID-19 pandemic. (*Id.* ¶¶ 25-26). Garnet Health, in response to the pandemic, adopted various precautions to mitigate the spread of COVID-19, including requiring masking and social distancing. (*Id.* ¶¶ 27-30; CntrStmt. ¶¶ 6-7). Christopher Costello, Garnet Health's Director of Occupational Health and Wellness, and Christine Goodhart, Garnet Health's Senior Administrator of Human Resources/Payroll Operation, were largely responsible for ensuring Garnet Health's compliance with New York's COVID-19 guidance. (56.1 Stmt. ¶¶ 31, 49, 82).

On August 18, 2021, the New York Commissioner of Health issued an "Order for Summary Action" pursuant to New York Public Health Law § 16 ("Emergency Order"). (*Id.* ¶ 34). The Emergency Order required certain healthcare entities to ensure that their employees were fully

---

paragraphs in Defendants' 56.1 Statement. (*See, e.g.*, 56.1 Stmt. ¶¶ 51, 83, 93-97, 100, 121, 144). The Second Circuit "has instructed that Local Rule 56.1 is 'strict.'" *McGowan v. Stanley*, No. 23-7769-CV, 2024 WL 5038633, at *2 (2d Cir. Dec. 9, 2024) (quoting *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009)). And "district courts are 'not required to consider what the parties fail to point out in their Local Rule 56.1 statements.'" *Id.* (quoting *T.Y.*, 584 F.3d at 417). Under these circumstances, where appropriate, the Court "deem[s] admitted the facts asserted in [Defendants'] Local Rule 56.1 statement because they were not specifically controverted by [Plaintiff] in the manner demanded by Local Rule 56.1." *Malarczyk v. Lovgren*, No. 22-504, 2023 WL 8073099, at *1 (2d Cir. Nov. 21, 2023) (summary order).

vaccinated against COVID-19, but allowed those entities to exempt employees from the vaccination requirement for medical and religious reasons. (*Id.* ¶¶ 35-36).[6]

On August 17, 2021, Garnet Health sent a memorandum to all employees which stated that, consistent with the Emergency Order, "[a]ll employees who are not fully vaccinated against Covid-19 by September 27th[, 2021] will be prohibited from working and subject to disciplinary action up to and including termination." (*Id.* ¶¶ 46-47; Saccomano Aff., Ex. 13). The August 17, 2021 memorandum also recognized that "[t]here are limited exceptions to the vaccine mandate for medical and religious reasons. Medical reasons include those who have a medical exemption due to an adverse reaction because of an allergy to one of the vaccine components or a medical contraindication." (Saccomano Aff., Ex. 13). Garnet Health employees were required to submit any exemption requests, with supporting documentation, to a confidential email address monitored by Mr. Costello and Ms. Goodhart, or directly to Mr. Costello. (56.1 Stmt. ¶¶ 49-50; CntrStmt. ¶¶ 15-16).[7]

Plaintiff, on August 18, 2021, submitted an exemption request to the confidential email address, stating:

> I will not be taking the COVID vaccine due to a previous vaccine reaction which is documented in my employee record. Hx severe reaction to the DTAP vaccine which caused swelling of lower limbs and the inability to walk for 2 weeks. My brother

[6] New York Governor Andrew M. Cuomo announced on August 16, 2021 that "[t]he State Department of Health will issue Section 16 Orders requiring all hospitals, [long-term care facilities], and nursing homes to develop and implement a policy mandating employee vaccinations, with limited exceptions for those with religious or medical reasons." *Governor Cuomo Announces COVID-19 Vaccination Mandate for Healthcare Workers*, NEW YORK STATE (August 16, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-vaccination-mandate-healthcare-workers. The Court "may take judicial notice of documents from official government websites" and takes judicial notice of Governor Cuomo's August 16, 2021 announcement. *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023).

[7] Garnet Health also sent a memorandum to employees on August 19, 2021, advising that medical exemption requests required "a licensed physician or nurse practitioner to certify that immunization with Covid-19 vaccine is detrimental to an individual based on a specific pre-existing health condition," and a letter to unvaccinated employees on August 20, 2021, advising them of the Emergency Order and directing them to speak with Mr. Costello regarding any questions that they had. (56.1 Stmt. ¶¶ 68-72).

> has the same hx with the DTAP vaccine and is in the Airforce. He was required to take the COVID vaccine and had a severe reaction to the 1st shot (swelling and multiple large hard lumps and several locations of his body). He was exempted from receiving a second dose.

(56.1 Stmt. ¶ 60). Plaintiff had received the DTaP vaccine when she was under the age of ten and had an adverse reaction. (56.1 Stmt. ¶ 61; Cntrstmt. ¶ 29).[8] Garnet Health responded to Plaintiff's exemption request on August 19, 2021, requesting "a note from [her] physician outlining [her] reaction and their opinion that [she] should not receive another vaccine." (56.1 Stmt. ¶ 62; Cntrstmt. ¶ 32).

On August 26, 2021, the New York Department of Health replaced the Emergency Order with a rule adopted pursuant to New York's emergency rulemaking procedures, N.Y. Comp. Codes, R. & Regs. tit. 10, § 2.61 ("DOH Mandate"). (56.1 Stmt. ¶ 37). The DOH Mandate, required all covered entities to ensure that personnel were "fully vaccinated against COVID-19, with the first dose for current personnel received by September 27, 2021 . . . ." (*Id.* ¶ 38).[9] The DOH Mandate still allowed medical exemptions for employees but no longer allowed religious exemptions. (*Id.* ¶¶ 41-42). The DOH Mandate allowed for a medical exemption to the COVID-19 vaccination requirement "[i]f any licensed physician or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of a member of a covered entity's personnel, based on a pre-existing health condition . . . ." (*Id.* ¶ 42 (alteration in original) (quoting 10

---

[8] "DTaP" refers to diphtheria, tetanus, and pertussis. *See DTaP (Diphtheria, Tetanus, Pertussis) Vaccine VIS*, CDC (Aug. 6, 2021). https://www.cdc.gov/vaccines/hcp/current-vis/dtap.html.

Plaintiff also previously received the 2-M-M-R, hepatitis B, and flu vaccines. (*See* 56.1 Stmt. ¶¶ 3-4). Plaintiff received the flu vaccine, at least once, while she was employed by Garnet Health. (*Id.* ¶ 4). Plaintiff does not allege that she had an adverse reaction to any of these vaccines.

[9] Garnet Health, a "hospital" within the meaning of section 2801 of the New York Public Health Law, was a "covered entity" within the meaning of the DOH Mandate. (*Id.* ¶¶ 40, 43-44).

N.Y.C.R.R. § 2.61(d)).[10] Defendant Batulis, Garnet Health's President and CEO, was responsible for ensuring Garnet Health's compliance with the DOH Mandate. (*Id.* ¶ 32).

On August 30, 2021, Plaintiff submitted a medical note from Dr. Stefan G. Chevalier to Garnet Health's confidential email address. (*Id.* ¶¶ 66-67, 73). The note stated: "Christina Caravello is a patient that has significant adverse reactions to medications, i.e., antibiotics, latex, and vaccinations. Given the Covid19 possible complications and Ms. Caravello's reaction to the DTaP vaccine (see attached) she should not be given the Covid19 vaccine." (*Id.* ¶ 74). The doctor's note attached a "Health Summary" which notes an allergy to penicillin, and self-reported allergies to penicillin, latex, and "Diphth,Pertus(Acell),Tetanus." (Saccomano Aff., Ex. 17 at 3). The self-reported DTaP vaccine allergy had a comment which stated: "Swelling of lower limbs and inability to walk for 2 weeks." (*Id.*). Dr. Chevalier's recommendation was based on information self-reported by Plaintiff, and not any testing done by Dr. Chevalier. (56.1 Stmt. ¶ 75). Plaintiff had informed Garnet Health, when she was hired, of her prior adverse reaction to the DTaP vaccine. (CntrStmt. ¶ 29).

Garnet Health's Human Resources Department, including Mr. Costello and Ms. Goodhart, were responsible for accepting and processing written exemption requests, and presenting them to a committee of Garnet Health's executive leaders for consideration. (56.1 Stmt. ¶¶ 81-83). Defendant Batulis was present for the committee meetings and was the "ultimate decision maker" with respect to medical exemption requests. (*Id.* ¶¶ 85, 99). Plaintiff's prior reaction to the DTaP vaccine was disclosed to the committee. (CntrStmt. ¶ 42). The committee concluded that Plaintiff's

---

[10] On August 30, 2021, Garnet Health issued a memorandum to employees apprising them that the DOH Mandate did not permit religious exemptions to the vaccination requirement. (56.1 Stmt. ¶ 78). The August 30, 2021 memorandum also stated: "[a]ll employees who do not get their first shot by September 27th will be sent off duty without pay and will automatically be deemed to have resigned employment from Garnet Health giving seven days' notice." (56.1 Stmt. ¶ 79).

medical exemption request and doctor's note was not evidence of a contraindication to the COVID-19 vaccine. (56.1 Stmt. ¶ 95). The Committee also decided to deny Plaintiff's exemption request because of her "patient-facing role in a population of patients that were compromised with chronic diseases" and she would be "a direct threat to co-workers and staff," which would, in turn, pose an "undue hardship on the organization." (*Id.* ¶ 96; CntrStmt. ¶¶ 53-54).

On September 13, 2021, Defendant Batulis sent Plaintiff a letter, informing her that her medical exemption request was denied because it: "(1) was not based on a qualifying medical/pregnancy condition; (2) was not reasonable; (3) would impose an undue hardship; and/or (4) would create a direct threat." (56.1 Stmt. ¶ 101). This letter explained that Garnet Health "could not accommodate her because she could not continue to work on a unit with high-risk patients and be unvaccinated" and "that placing Ms. Caravello in another position would be an undue hardship because they would have to hire another employee to replace her role and did not have another position based on her expertise and specialization." (*Id.* ¶ 103). The letter also offered Plaintiff the option of receiving "the vaccine under medical observation in an Urgent Care or Emergency Department setting at no expense . . . ." (*Id.* ¶ 104). Plaintiff took exception to this solution, given her reaction to the DTaP vaccine and her brother's reaction to the COVID-19 vaccine. (*Id.*; Caravello Decl. ¶ 14). The letter also stated:

> Personal protective equipment and routine testing is not equivalent to the effectiveness of the vaccine and therefore is not a reasonable accommodation we can make in lieu of getting vaccinated. While working without a vaccine was the best we could manage when the pandemic first hit, our patients and your colleagues are entitled to the best protection now available without the risk created by those around them being unvaccinated.

(56.1 Stmt. ¶ 106).

Plaintiff, after receiving Defendant Batulis' September 13, 2021 letter, spoke with Mr. Costello, who informed Plaintiff how to appeal the denial of her exemption request. (*Id.* ¶ 108).

On September 17, 2021, Plaintiff appealed the denial of her exemption request. (56.1 Stmt. ¶ 112; CntrStmt. ¶ 63). Plaintiff stated, in this email: "My concern is not that I will have an immediate anaphylactic response . . . I am afraid of developing inflammation in the days, weeks or months following vaccination which impairs my ability to function and could lead to death." (Saccomano Aff., Ex. 20). Plaintiff, in her email, also included articles about the potential risk of Guillan-Barre Syndrome from COVID-19 vaccines. (56.1 Stmt. ¶¶ 114-18). Plaintiff has never been diagnosed with Guillan-Barre Syndrome, and her exemption request did not mention Guillan-Barre Syndrome. (*Id.* ¶¶ 76, 119). On September 23, 2021, Plaintiff was informed via email that her appeal was denied because Garnet Health could not "accommodate what she was seeking." (*Id.* ¶ 120; Saccomano Aff., Ex. 21). Plaintiff was informed that September 27, 2021 would be her last day of work, and she would be terminated on October 4, 2021. (CntrStmt. ¶ 64).

On September 24, 2021, Plaintiff contacted Deborah Snyder, Garnet Health's Interim Vice President, stating that she experienced a mental health crisis on September 23, 2021. (56.1 Stmt. ¶ 124). Ms. Snyder arranged for Plaintiff to meet with Dr. Ulrick Vieux, the Chairman of the Department of Psychiatry and Residency Program Director for Psychiatry for Garnet Health. (*Id.* ¶ 125). Plaintiff testified that she met with Dr. Vieux on September 24, 2021, by telephone. (*Id.* ¶ 126). Plaintiff did not request FMLA leave. (*Id.* ¶ 143).

On September 27, 2021, Plaintiff was informed that she was being placed on administrative leave without pay for failure to comply with the DOH Mandate. (*Id.* ¶ 135).[11] Plaintiff was informed by Garnet Health that if she did "not obtain the first dose of the COVID-19 Vaccine by 4:00pm on October 4, 2021, we will adjust our records to indicate that you resigned your position."

[11] Plaintiff also submitted a request for a religious exemption from the COVID-19 vaccine mandate on September 27, 2021, which was denied because the DOH Mandate did not permit religious exemptions. (56.1 Stmt. ¶¶ 128-30, 132-33).

(*Id.* ¶ 136). Garnet Health informed Plaintiff, on October 4, 2021, that because she had not received the COVID-19 vaccine, she was deemed to have voluntarily resigned from her position. (*Id.* ¶ 140). Garnet Health sent Plaintiff another letter on October 5, 2021, also informing her that she was deemed to have resigned effective October 4, 2021. (56.1 Stmt. ¶ 142).

Plaintiff filed a Charge of Discrimination with the EEOC on July 29, 2022. (56.1 Stmt. ¶ 145). The EEOC issued a Notice of Dismissal and Notice of Right to Sue on Plaintiff's EEOC Charge on February 15, 2024. (56.1 Stmt. ¶ 146).

This litigation followed.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes

with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is not the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Harford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her . . . claim, the District Court properly granted summary judgment dismissing that claim."). Simply put, the movant must separately establish that the law favors the judgment sought. "Courts have acknowledged the dangers of

summary judgment in discrimination cases: Because direct evidence of discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Osekavage v. Sam's E., Inc.*, 619 F. Supp. 3d 379, 389 (S.D.N.Y. 2022) (citation modified).

## ANALYSIS

Plaintiff pleads three claims for relief for: (1) failure to accommodate and discrimination on the basis of disability pursuant to the ADA against Defendant Garnet Health; (2) failure to accommodate and discrimination on the basis of her disability, and aiding and abetting such discrimination, pursuant to the NYSHRL against Defendant Garnet Health and Defendant Batulis, respectively; and (3) interference pursuant to the FMLA against Defendant Garnet Health. (Compl. ¶¶ 22-25).

### I. Failure to Accommodate and Disability Discrimination Under the ADA

Defendants seek judgment as a matter of law on Plaintiff's failure-to-accommodate claim arguing: (1) Plaintiff cannot establish that she was disabled within the meaning of the ADA; (2) Garnet Health had no notice of Plaintiff's claimed disability that would trigger any duty to accommodate; (3) Plaintiff was not qualified for her position, with reasonable accommodation; and (4) Plaintiff's proposed accommodation would have been an undue hardship on Garnet Health. (Defs. Br. at 15-26).

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). The three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is used to analyze discrimination claims under the ADA. *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, No. 20-03718, 2022 WL 1715977, at *2 (2d Cir. May 27, 2022). The plaintiff must first, under that framework, establish

a *prima facie* case of employment discrimination based on a disability before the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged actions. *Id.*; *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) ("Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which causes the burden of production to shift to the defendant to offer a legitimate, nondiscriminatory rationale for its actions."). If the defendant offers a legitimate, non-discriminatory reason for the challenged actions, then the burden shifts back to the plaintiff to "produce evidence and carry the burden of persuasion that the proffered reason is pretext." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).

A plaintiff, to establish a *prima facie* case for failure to accommodate under the ADA, must show by a preponderance of the evidence that: (1) "h[er] employer is subject to the ADA"; (2) "[s]he was disabled within the meaning of the ADA"; (3) "with reasonable accommodation, [she] could perform the essential functions of [her] job"; and (4) "h[er] employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (first quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam); and then quoting *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019)).[12]

[12] The parties do not address whether Defendant Garnet Health was an employer "subject to the ADA" in their briefing. (*See* Defs. Br.; Pl. Br.; Reply). Accordingly, the Court will assume, without deciding, that Defendant Garnet Health is an employer subject to the ADA for the purposes of analyzing Defendants' motion for summary judgment. *See, e.g.*, *Forgione v. City of New York*, No. 11-CV-05248, 2012 WL 4049832, at *8 n.7 (E.D.N.Y. Sept. 13, 2012) ("assum[ing] without deciding" that the plaintiff was disabled within the meaning of the ADA "[b]ecause defendants d[id] not challenge" that issue).

a. Disability Under the ADA

Defendants attack the second element required for a *prima facie* case of a failure-to-accommodate and disability discrimination claim, arguing that Plaintiff cannot make a *prima facie* showing that she was disabled within the meaning of the ADA. (Defs. Br. at 17-20). The Court agrees.

"A person has a 'disability' under the ADA . . . if [s]he has: (a) 'a physical or mental impairment that *substantially limits* one or more [of her] major life activities,' (b) 'a record of such impairment,' or (c) is 'regarded as having such an impairment.'" *Veldran v. Dejoy*, 839 F. App'x 577, 579 (2d Cir. 2020) (summary order) (quoting 42 U.S.C. § 12102(1)). "Major life activities," in turn, are defined to "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[C]ourts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998).

Plaintiff has failed to make a *prima facie* case that she had "a physical or mental impairment that substantially limits one or more [of her] major life activities," within the meaning of the ADA.[13] 42 U.S.C. § 12102(1)(A). Plaintiff pled in her Complaint that her disability was an "inability to take this vaccination" and "her medical incapacity to safely be immunized . . . ." (Compl. ¶¶ 11, 22). Plaintiff, in her exemption request to Garnet Health, cited a "childhood vaccine reaction" as the basis for her requested exemption and the doctor's note submitted by Plaintiff to

[13] Plaintiff does not argue that she had "a record of such impairment" or was regarded by Defendants "as having such an impairment." (*See* Pl. Br.).

Garnet Health cited her "adverse reactions to medications, i.e., antibiotics, latex, and vaccinations." (Saccomano Aff., Ex. 17 at 2).[14] The doctor's note attaches a "Health Summary" which notes an allergy to penicillin, and self-reported allergies to penicillin, latex, and the DTaP vaccine. (*Id.* at 3).

Defendants argue that an "inability" to receive a vaccine "is not a recognized physical or mental impairment." (Defs. Br. at 18; *see also* Reply at 9 ("[A]n alleged 'medical incapacity' or 'inability' to receive a vaccine does not constitute a physical impairment."). Indeed, Courts in this Circuit have routinely rejected claims that a speculative reaction to the COVID-19 vaccine is a disability within the meaning of the ADA, even when accompanied by a doctor's note. *See, e.g.*, *Cecere v. Canisius Univ.*, No. 24-CV-00155, 2025 WL 712748, at *4 (W.D.N.Y. Mar. 5, 2025), *aff'd*, No. 25-798-CV, 2025 WL 3239732 (2d Cir. Nov. 20, 2025) (finding the plaintiff was not disabled within the meaning of the ADA where the plaintiff submitted a doctor's note to his employer which stated that he had "adverse reactions" to "other vaccinations and medications."); *Phillips v. White Plains Hospital*, No. 23-CV-11326, 2025 WL 448808, at *4 (S.D.N.Y. Feb. 10, 2025) (finding the plaintiff was not disabled within the meaning of the ADA where the doctor's "description [was] insufficiently specific to permit the Court to determine either the nature, 'frequency, duration, or severity' of the disability claimed by Plaintiffs."); *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 217-18 (N.D.N.Y. 2024) (finding that the plaintiff was not disabled within the meaning of the ADA where "[i]t [was] undisputed that in 2009, [the plaintiff] developed temporary paralysis in her hands and IBD symptoms" in response to the Gardasil vaccine).

---

[14] Plaintiff quotes the doctor's note as also stating that Plaintiff "would suffer adverse medical response from COVID vaccination." (Pl. Br. at 16 ("quoting" Saccomano Aff., Ex. 17)). The doctor's note does not say this. (*See* Saccomano Aff., Ex. 17 at 2).

In *Cecere*, the plaintiff was dismissed from his physician's assistant program with the defendant-university because he did not receive the COVID-19 vaccine. 2025 WL 712748, at *1-2. The physician's assistant program required all candidates to complete clinical rotations, and the clinical rotations required COVID-19 vaccination. *See id.* at *1. The plaintiff had submitted an exemption request, and a letter from a doctor in support of his request, which stated that he should be exempt from the COVID-19 vaccine mandate because of his "adverse reactions" to "other vaccinations and medications." *Id.* at *4. The defendant-university rejected plaintiff's exemption request. *See id.* at *2. The court, noting that "courts in this circuit have repeatedly rejected claims that a reaction to the COVID-19 vaccine rises to the level of a disability under the ADA," granted the defendants' motion to dismiss the plaintiff's ADA disability discrimination claim because Plaintiff's claimed disability was "speculative." *Id.* at *5 (collecting cases). The doctor's letter provided by the plaintiff did "not indicate that Plaintiff will have an allergic reaction to the COVID-19 vaccine but just generically reference[d] prior reactions to unspecified vaccines and state[d] with no specifics that Plaintiff 'is unable to get the covid 19 vaccine.'" *Id.* The Second Circuit affirmed, stating that, "[a]t most," the plaintiff had alleged "that he ha[d] experienced allergic reactions to *other* vaccines in the past" and had not "allege[d] any non-speculative factual basis for inferring that his reactions to these other vaccines would be replicated if he were to receive a COVID-19 vaccine." *Cecere*, 2025 WL 3239732, at *2.

Likewise, in *Phillips*, the court rejected the plaintiffs' ADA claims because they did "not sufficiently allege that they suffer[ed] from a disability within the meaning of the ADA." 2025 WL 448808, at *4. Like the plaintiff in *Cecere*, the plaintiffs in *Phillips* submitted a doctor's note in support of their request to be exempted from the COVID-19 vaccine mandate. *See id.* The doctor's note provided that the plaintiffs' "genetic bio-variance *could cause* [a] massive allergic reaction"

to the COVID-19 vaccine which could "adversely impact the [Plaintiffs'] immunity permanently and [Plaintiffs'] future offspring." *Id.* (alterations in original). The doctor's "description [was] insufficiently specific to permit the Court to determine either the nature, 'frequency, duration, or severity' of the disability claimed by Plaintiffs." *Id.* (quoting *Mercer v. ViacomCBS/Paramount*, No. 22-CV-06322, 2024 WL 3553133, at *4 (S.D.N.Y. July 26, 2024)).[15]

Here, the doctor's note submitted by Plaintiff is insufficiently specific and too speculative to allow the Court to determine that she has a disability within the meaning of the ADA just like the doctor's notes submitted by the plaintiffs in *Cecere* and *Phillips*. Plaintiff's doctor's note cites "possible complications" from the COVID-19 vaccine, relying on Plaintiff's self-reported previous reaction to the DTaP vaccine. (Saccomano Aff., Ex. 17 at 2). The speculative nature of the doctor's note provided by Plaintiff is insufficient to establish that her alleged "inability" to receive the COVID-19 vaccine is a disability within the meaning of the ADA. *Accord Cecere*, 2025 WL 712748, at *4; *Phillips*, 2025 WL 448808, at *4; *see also Mercer*, 2024 WL 3553133, at *5 ("An alleged medical contraindication to a vaccine, even if predicated on prior adverse reactions to a vaccination, is insufficient to allege a protected disability if it does not result in 'a substantial limitation of a major life activity.'" (citing *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 160, 164-65 (S.D.N.Y. 2020)).

Plaintiff's arguments to the contrary are unavailing. Plaintiff argues that she did have "a physical impairment that substantially limit[ed] one or more life activities," citing: (1) that she notified Garnet Health "that she could not take vaccination" when she was hired; (2) her doctor's note in support of her exemption request supports that she had a disability; and (3) without citing to any evidence, that her "medical incapacity" derived "from her body's response to an element of

[15] Plaintiff states that her "situation is distinguishable from that Judge Karas considered in *Phillips*," but provides no explanation for how it is distinguishable. (Pl. Br. at 19-20).

the COVID vaccination [that was also present in the prior vaccination she had] which caused her loss of mobility for two weeks." (Pl. Br. at 16-17). As discussed above, Plaintiff's doctor's note is insufficiently specific to make a *prima facie* showing that she had a disability within the meaning of the ADA. Furthermore, Plaintiff does not cite any evidence that there is "an element of the COVID vaccination" that was also present in the DTaP vaccine which caused her adverse reaction to the DTaP vaccine and would cause her to have an adverse reaction to the COVID-19 vaccine. (*See* Pl. Br. at 17).

That Plaintiff notified Garnet Health when she was first hired that she had an allergic response to the DTaP vaccine as a child is also of no moment. Plaintiff, to make out a *prima facie* claim for failure to accommodate, must submit evidence that, at the time she requested the accommodation, she had a disability within the meaning of the ADA. *Norman*, 492 F. Supp. 3d at 162 ("Courts look to whether the plaintiff was disabled at the time the accommodation was sought."). Plaintiff has not done so. Plaintiff testified that she submitted records of receiving other vaccinations upon her employment with Garnet Health, and also received the flu vaccine while employed by Garnet Health. (56.1 Stmt. ¶¶ 3-4).[16] Plaintiff does not explain how she was able to receive those vaccines in light of her alleged "medical incapacity to safely be immunized," but would not be able to safely receive the COVID-19 vaccine. "In the absence of this kind of evidentiary showing, no reasonable factfinder could conclude that plaintiff suffered from a physical impairment that substantially limited one of her major life activities." *Lake*, 738 F. Supp. 3d at 217.

[16] Plaintiff states, in her opposition: "Indeed, plaintiff has not taken another vaccination since childhood because of her manifested reaction, not some subjective fear." (Pl. Br. at 19). Plaintiff admitted in the 56.1 Statement that she "submitted proof of immunity and had received the 2-M-M-R and hepatitis B vaccines" and "received the flu vaccine at [Garnet Health]'s Employee Health Department at least one time while employed by [Garnet Health]." (56.1 Stmt. ¶¶ 3-4).

Plaintiff also appears to argue that, because she previously experienced "paralysis"[17] from "a vaccine with the same component as that contained in the COVID-19 vaccination," her fear of developing Guillan-Barre Syndrome is somehow a disability. (Pl. Br. at 19). This argument is without merit. *See Jacobs v. Mercy Health*, 719 F. Supp. 3d 894, 902 (E.D. Mo. 2024) (granting the defendants' motion for summary judgment on the plaintiff's failure-to-accommodate claim because "[o]ne record noting a "*high potential*" or "*risk*" for a disability based solely on Plaintiff's self-reported reaction from a vaccine three years prior [was] insufficient to demonstrate that [the plaintiff had] [Guillan-Barre Syndrome] or was otherwise actually disabled.").

Finally, to the extent Plaintiff argues that her brother's reaction to the COVID-19 vaccine establishes that she would have a similar reaction the vaccine and therefore had a disability, that argument has been rejected by courts in this district. *See Perez v. N.Y. Presbyterian/Weill Cornell Medical Center*, No. 23-CV-06152, 2024 WL 1514216, at *6 (S.D.N.Y. Apr. 8, 2024) (holding that the plaintiff had "failed to plausibly allege that her reactions to the flu shot and her family history of reactions to the COVID-19 vaccine substantially limit[ed] her ability to work, and thus, those reactions are not a qualifying disability under the statute.").

In sum, Plaintiff cannot meet the basic requirement of the ADA—she cannot make a *prima facie* showing that she has "a physical or mental impairment that substantially limits one or more

[17] The Court notes that there is no evidence in the record that Plaintiff experienced paralysis from the DTaP vaccine. Plaintiff reported that she experienced "swelling of lower limbs and the inability to walk for 2 weeks" following the DTaP vaccine, not paralysis. (Saccomano Aff., Exs. 16-17).

[of her] major life activities." 42 U.S.C. § 12102(1)(A). Thus, Plaintiff's reasonable accommodation and disability discrimination claim fails.[18]

b. Reasonable Accommodation

Plaintiff must also show, to establish a *prima facie* case for failure to accommodate, that "with reasonable accommodation, [she] could perform the essential functions of the job at issue." *Tudor*, 132 F.4th at 246 (2d Cir. 2025) (quoting *Natofsky*, 921 F.3d at 352). "As to the requirement that an accommodation be reasonable," a plaintiff has a burden of production "to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). Additionally, if a Plaintiff makes a *prima facie* showing, "the defendant's burden merges with showing the proposed accommodation is unreasonable, with its burden of showing 'as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship.'" *Abramov v. Northwell Health Sys.*, No. 22-CV-06687, 2024 WL 4276171, at *11 n.17 (E.D.N.Y. Sept. 24, 2024) (quoting *Borkowski*, 63 F.3d at 138); *see also Greenbaum v. N.Y. City Transit Auth.*, No. 21-1777, 2022 WL 3347893, at *4 (2d Cir. Aug. 15, 2022) (summary order) ("Once a plaintiff has made out a *prima facie* showing that the requested accommodation is available, the burden then shifts to the defendant to show that the requested accommodation is unreasonable or would impose an undue hardship on the employer." (citation modified)).

[18] To the extent that the Complaint may be construed as pleading a claim for disability discrimination based on an adverse action (Compl. ¶¶ 22-25), a claim of discrimination based upon Plaintiff's alleged disability would likewise fail. *See White v. Sears, Roebuck & Co.*, No. 07-CV-04286, 2009 WL 1140434, at *11 (E.D.N.Y. Apr. 27, 2009) ("[B]ecause Plaintiff has not provided sufficient evidence from which a finder of fact could conclude that he is a person with a disability under . . . the ADA, Plaintiff cannot establish a prima facie claim of intentional discrimination or a failure to make reasonable accommodations."); *Sanya Lanausse v. City of New York*, No. 15-CV-01652, 2016 WL 2851337, at *2 (S.D.N.Y. May 13, 2016).

Plaintiff proposed masking, social distancing, and eliminating patient contact as accommodations. (*See* CntrStmt. ¶ 12; Caravello Decl. ¶ 11).[19] Here, even were Plaintiff disabled within the meaning of the ADA, Plaintiff has failed to show that her proposed accommodations were reasonable. Likewise, Defendants have shown that, even had Plaintiff established a *prima facie* case for her failure-to-accommodate claim, Defendants had a legitimate, non-discriminatory reason to terminate Plaintiff, because granting Plaintiff's proposed accommodations would have posed an undue hardship on Defendants.

Plaintiff's proposal that Defendants "ensure that [she] had no contact with patients" was not reasonable. It is undisputed that Plaintiff could not perform her job duties without patient contact. (56.1 Stmt. ¶ 107). Thus, elimination of patient contact was not a reasonable accommodation as it would pose an "undue hardship" that is "substantial in the overall context of [Defendant's] business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023); *see also, e.g.*, *Shahid-Ikhlas v. New York*, No. 22-CV-10643, 2023 WL 3628151, at *5 (S.D.N.Y. May 5, 2023) ("At a minimum, Plaintiff would be unable to perform patient care duties requiring physical contact with patients and, thus, Defendants would have to require another nurse to cover those duties or hire a replacement nurse. Either option would impose a cost on Defendant of the kind the Supreme Court has found to be more than *de minimis*." (citing *TWA v. Hardison*, 432 U.S. 63, 84 (1977))).

So too, masking and social distancing were not reasonable accommodations. These proposed accommodations, in addition to requiring Defendants to violate the DOH Mandate, were unreasonable because of "the obvious hardship associated with the increased health and safety risk posed to other employees and patients by allowing Plaintiff[] to remain unvaccinated while

[19] Plaintiff also states, in her brief, that she proposed testing for COVID-19 infection as an accommodation, but cites no evidence that she actually proposed testing as an accommodation. (*See* Pl. Br. at 21-24). Accordingly, the Court only considers the reasonableness of the accommodations that Plaintiff actually proposed—masking, social distancing, and eliminating patient contact.

working at [Defendants'] facilities, and the risk of civil liability to anyone infected by an unvaccinated employee." *Pastor v. Mercy*, No. 22-CV-07847, 2024 WL 3029118, at *5 (E.D.N.Y. June 17, 2024) (quoting *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-02929, 2023 WL 3467143, at *6 n.7 (S.D.N.Y. May 15, 2023)); *see also Does v. Hochul*, 632 F. Supp. 3d 120, 145 n.28 (E.D.N.Y. Sept. 30, 2022), *rev'd on other grounds*, 2024 WL 5182675 (2d Cir. Dec. 20, 2024) (stating, in the Title VII context, that "an increase in infections and its deleterious effect on staff and patients" was an "obvious hardship" on the defendants as was the potential "legal liability if a patient or resident treated by an unvaccinated employee were to contract COVID-19.").

Thus, Plaintiff's ADA claim likewise fails because she could not perform the essential functions of her position, even with a reasonable accommodation, and Defendants have shown a legitimate, non-discriminatory reason for denying Plaintiff's requested accommodations.

Accordingly, Plaintiff's ADA claim is dismissed because Plaintiff: (1) did not have a disability within the meaning of the ADA; (2) could not perform the essential functions of her position, with a reasonable accommodation; and (3) accommodating Plaintiff would have imposed an undue hardship on Defendant Garnet Health.[20]

II. <u>FMLA Interference</u>

Plaintiff's fourth claim for relief is for FMLA interference. (Compl. ¶ 25). Defendants argue that Plaintiff's FMLA interference claim fails as a matter of law because: "(1) Ms. Caravello was not entitled to FMLA leave; (2) she did not provide notice of any intent to take such leave; (3) she suffered no prejudice from any alleged failure to notify her of FMLA rights; and (4) she did

[20] Having dismissed Plaintiff's ADA claim on these grounds, the Court need not and does not reach Defendants' additional arguments that Garnet Health did not have notice of Plaintiff's disability and that Garnet Health offered Plaintiff a reasonable accommodation.

not meet the FMLA's eligibility requirements until after her employment had already ended." (Defs. Br. at 26-27).

"The FMLA affords qualified employees who cannot work due to a 'serious health condition' up to twelve weeks of leave in a year." *Arizmendi v. Rich Prods. Corp.*, No. 22-1971, 2023 WL 4246106, at *1 (2d Cir. June 29, 2023) (summary order) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziado v. Culinary Inst. of America*, 817 F.3d 415, 424 (2d Cir. 2016) (first citing 29 U.S.C. § 2615(a)(1)); and then citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)). Thus, "to prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA. *Id.*[21]

a. Entitled to Take Leave

Defendants argue that Plaintiff fails to satisfy the third prong required for a *prima facie* case of FMLA interference—that she was entitled to take leave. (Defs. Br. at 27-29). The Court agrees.

[21] Defendants do not address the second element required for Plaintiff's FMLA interference claim. (*See* Defs. Br.; Reply). Accordingly, the Court assumes for purposes of this motion, without deciding, that Garnet Health was an employer as defined by the FMLA.

A plaintiff may be entitled to take leave under the FMLA if she has a "serious health condition." *Arizmendi*, 2023 WL 4246106, at *1. "'[A] serious health condition' includes any 'illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider.'" *Id.* "One way to demonstrate a serious health condition based on continuing treatment is to show that the underlying condition involves a 'period of incapacity of *more than three consecutive, full calendar days*." *Id.* (quoting 29 C.F.R. § 825.115(a)).

Plaintiff argues that she had a serious health condition because: (1) she "experience[d] serious suicidal ideation which eventuated in an effort to kill herself several weeks later"; and (2) she "had contacts with two healthcare providers, Snyder and Vieux, within a 24-hour period between September 23-24, 2021." (Pl. Br. at 26-27). Defendants respond that, on September 23 and 24, 2021 when Plaintiff experienced suicidal ideations, "she was not incapacitated," and she "received no treatment until after termination, and did not receive prescribed medication until November 3, 2021." (Reply at 14).

Indeed, "in order to constitute a 'serious health condition' under the FMLA, [Plaintiff's] health condition must have necessitated either 'inpatient care' or 'continuing treatment by a health care provider' as defined in detail in the regulations." *Robles v. Medisys Health Network, Inc.*, No. 19-CV-06651, 2022 WL 3403191, at *15 (E.D.N.Y. June 19, 2020). Plaintiff does not claim that her condition required inpatient care prior to her termination, and even assuming it is true that Plaintiff met with Dr. Vieux and consulted with Ms. Snyder, Plaintiff has not shown that she had "continuing treatment" within the meaning of the FMLA. *See id.* (finding that the plaintiff's "severe mental health symptoms" were not a serious health condition where he did not allege "an overnight stay in a hospital, hospice, or residential medical care facility" and "had undergone treatment only once"). Plaintiff has offered evidence that she met one time with a health care

provider. (56.1 Stmt. ¶¶ 124-25). This is insufficient to establish that Plaintiff had a serious health condition.[22]

Furthermore, "it is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *Pearson v. Unification Theol. Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. Mar. 23, 2011). Here, it is undisputed that Plaintiff was apprised of the decision to terminate her before she informed Defendants of her emotional distress. (56.1 Stmt. ¶¶ 124-25; CntrStmt. ¶¶ 64, 72). Thus, Plaintiff was not denied any right to leave under the FMLA. *Pearson*, 785 F. Supp. 2d at 162; *see also Santos v. Knitgoods Workers' Union, Local 155*, 252 F.3d 175, 179 (2d Cir. 2001) ("[W]here the employer announced its decision to terminate a plaintiff before that plaintiff went on medical leave, plaintiff was 'not denied any right for none was preserved.'" (quoting *Carrillo v. National Council of Churches*, 976 F. Supp. 254, 256 (S.D.N.Y. 1997)).

b. Notice of Intent to Take Leave

Plaintiff also failed to satisfy the fourth element for an FMLA interference claim, as she did not give Defendants notice of her intent to take leave. Plaintiff admits that she never requested leave under the FMLA. (56.1 Stmt. ¶ 143). And Plaintiff submitted no evidence that she requested any leave whatsoever.

Plaintiff's principal argument as to this element of her FMLA interference claim is that she "need not have used the word 'FMLA' nor made a specific request for such leave to 'notice' her need for such leave . . . ." (Pl. Br. at 26-27). Plaintiff cites *Coutard v. Mun. Credit Union*, 848 F.3d 102, 111-12 (2d Cir. 2017), in support of her argument. The district court, in *Coutard*, granted

[22] Defendants also argue that Plaintiff's medical exemption request did not concern a serious health condition. (*See* Defs. Br. at 27-28). However, Plaintiff concedes that her FMLA claim is not premised on her medical exemption request. (*See* Pl. Br. at 28 ("[P]laintiff has never suggested that [her doctor's note] has any relationship to her FMLA claim.")).

summary judgment for the defendant-employer because, although the plaintiff requested FMLA leave to care for his grandfather, the plaintiff did not provide the defendant-employer sufficient information to determine that his request was FMLA eligible. *Id.* at 104. The Second Circuit reversed, reasoning that the employee's requested leave "may" have qualified under the FMLA. *Id.* at 112.

Here, unlike the Plaintiff in *Coutard*, Plaintiff never requested leave. As other courts in this Circuit interpreting *Coutard* have held, a plaintiff must still request leave to put a defendant on notice of their intention of taking leave. *See, e.g.*, *Macropoulos v. Metro Life Ins. Co.*, No. 15-CV-06096, 2018 WL 150864, at *13 (S.D.N.Y. Mar. 26, 2018) ("Although FMLA regulations do not require an employee to mention the FMLA specifically, they do require an employee to request leave, not just an accommodation." (citing 29 C.F.R. § 825.303(b))). Plaintiff, in support of her argument that Defendants had to provide her notice of her FMLA rights after she informed them of her mental health crisis, cites a number of cases, none of which refute this proposition. *See, e.g.*, *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, (D. Conn. 2018) ("[W]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's *leave* may be for an FMLA—qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave . . . ." (emphasis added)); *Slaughter v. American Bldg. Maintenance Co.*, 64 F. Supp. 2d 319, 325 (S.D.N.Y. Sept. 13, 1999) ("It is not necessary for an employee to invoke the statue expressly, or to refer to the statute *when communicating his or her need for leave to the employer*." (emphasis added)). These cases instead confirm that an employee must still request leave to put an employer on notice that the employee intends to take leave.

Thus, Plaintiff has failed to establish that she gave Defendants notice of her intent to take leave under the FMLA.

Accordingly, Plaintiff's FMLA interference claim is dismissed because she was not entitled to take leave and she did not provide Defendants notice of her intent to take leave.[23]

III. State Law Claims

Plaintiff also asserts state law claims under the NYSHRL. "A federal district court may decline to exercise supplemental jurisdiction over pendent state law claims when it 'has dismissed all claims over which it has original jurisdiction.'" *Offor v. Mercy Med. Ctr.*, No. 17-CV-01872, 2018 WL 2947971, at *7 (S.D.N.Y. May 31, 2018) (quoting 28 U.S.C. § 1367(c)(3)). Having dismissed all of Plaintiff's claims over which the Court has original jurisdiction, the Court declines to exercise jurisdiction over Plaintiff's state law claims. *See, e.g.*, *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 n.6 (2d Cir. 2017) ("Of course, a district court may decline to exercise supplemental jurisdiction over state and local law claims if it has dismissed all claims over which it has original jurisdiction.").

## CONCLUSION

Defendants' motion for summary judgment is GRANTED to the extent that Plaintiff's ADA and FMLA claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over the state law claims and they are dismissed without prejudice.

The Clerk of Court is respectfully directed to terminate the pending motion (Doc. 42) and close this case.

[23] Having dismissed Plaintiff's FMLA claim on these grounds, the Court need not and does not reach Defendants' arguments that Plaintiff was not prejudiced by any denial of FMLA leave and that she was not eligible for FMLA leave.

**SO ORDERED.**

Dated: White Plains, New York
August 21, 2026

PHILIP M. HALPERN
United States District Judge